(77 Misc. Rep. 3.)

### O'CONNELL v. PRESS PUB. CO.

(Supreme Court, Special Term, Kings County.    February, 1912.)

1. LIBEL AND SLANDER (§ 15*)—WORDS ACTIONABLE—CONSTRUCTION OF LAN-
   GUAGE.
   In deciding whether a newspaper article is libelous, the scope and the
   object of the entire article are to be considered together, and such a
   construction adopted as would naturally be given to it.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 1;
   Dec. Dig. § 15.*]

2. LIBEL AND SLANDER (§ 15*)—WORDS ACTIONABLE—CHARGE OF CRIME.
   A publication, when the American Sugar Refining Company, its officers,
   and employés were charged with defrauding the government by tamper-
   ing with the scales on which sugar, a dutiable commodity, was weighed
   to determine the import duty, of an article referring to weighing trick-
   ery and crooked scales, containing a false statement that plaintiff was
   the inventor of a corset steel device, which was shown by him to an
   official of the sugar company, who referred him to a superintendent,
   who was at the time of the publication on trial for a like fraud against
   the government, fairly charges plaintiff with an offense against Rev.
   St. U. S. §§ 5440, 5445 (U. S. Comp. St. 1901, pp. 3676, 3678), and Act
   Cong. June 10, 1900, c. 407, § 9, 26 Stat. 135 (U. S. Comp. St. 1901, p.
   1895); and a complaint alleging such facts is good on demurrer.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 1;
   Dec. Dig. § 15.*]

3. LIBEL AND SLANDER (§ 16*)—WORDS ACTIONABLE—IMPUTATION OF VICIOUS
   ACT.
   The publication, by imputing to plaintiff a vicious act, tended to di-
   minish his respectability and impair his comfort by the attendant dis-
   grace and contempt.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 1–9;
   Dec. Dig. § 16.*]

Action by Christopher J. O'Connell against the Press Publishing
Company for libel.    Demurrer to complaint overruled.

Judgment affirmed, 136 N. Y. Supp. 1142.

Hersey Egginton, of Brooklyn (Henry F. Cochrane, of Brooklyn,
of counsel), for plaintiff.

Howard Taylor (Charles B. Brophy, of New York City, of coun-
sel), for defendant.

STAPLETON, J.    The action is for damages for libel.    The pro-
ceeding is the trial of an issue at law.    The issue arises upon a de-
murrer to the complaint.    The complaint is designed to state two
causes of action.    The demurrer is interposed to both.    The ground
of the demurrer is that the complaint does not state facts sufficient
to constitute a cause of action.

The defendant is the publisher of the World and the Evening
World, daily newspapers published in the city of New York, and the
alleged libels were published in those newspapers.    The articles, re-

produced in the several causes of action and alleged to be libelous, are as follows:

"Fraud Indictment Near for Officer of Sugar Trust. Federal Grand Jury has Evidence, Gained From Men Now on Trial, Implicating Him in Weighing Trickery. One Witness is Inventor of 'Corset Steel' Spring. Weigher Testifies That Spitzer Told Him to 'See Bendernagel and Get an Envelope.'

"It developed yesterday that while Henry L. Stimson and some of his assistants have been introducing testimony against minor officials of the Sugar Trust on one floor of the Federal Building other assistant prosecutors have been endeavoring to indict men 'higher up' before the Federal Grand Jury on another floor of the building.

"The World is in a position to state that evidence has been adduced before the Federal Grand Jury which will result in the indictment of an official of the Sugar Trust for the very frauds the perpetration of which now forms the basis of the criminal cases against minor officials, and that these indictments will be based, in part at least, on the evidence of one or more of the men now on trial.

"On Wednesday Judge Martin of Vermont, who is trying the cases of Bendernagel, Spitzer and the four checkers, swore in the Federal Grand Jury for December. One of the first witnesses examined was John H. Thompson, a clerk at No. 117 Wall street, the office of the Sugar Trust, who had appeared before the petty jury hearing the cases against Spitzer, Bendernagel and others.

#### "Instructed by Trust Official.

"Thompson, it is understood, made known the official of the Sugar Trust upon whose acquiescence he paid the bills of the sugar shippers, which were based, not upon the Government weights, but upon the weights returned by the city weighers. He declared distinctly that he acted under instructions, and by his testimony an official of the trust is implicated in the frauds.

"The December Grand Jury also examined a witness named O'Connell, who has not appeared in the criminal trial. It is said he testified to having invented the corset steel spring device and to having shown it to an official of the trust, who referred him to Oliver Spitzer, dock superintendent. His testimony, it is understood, corroborated Thompson's to an extent.

"That action against some official higher up than Bendernagel was not taken by the previous Grand Jury is said to have been due almost entirely to the action of Breczinzski, the former treasury agent, who, with Richard Parr, was on the Sugar Trust piers when the raid was made on the crooked scales on Nov. 20, 1907. He has been at odds with Parr and appeared before the former Grand Jury voluntarily.

"Breczinzski told the Grand Jury that Parr was not to be believed under any circumstances. Presented with a case based on Parr's testimony and seemingly convincing, the Grand Jury found itself with a record on which every allegation made by Parr was declared a falsehood and refused to return an indictment.

"Judge Martin listened all yesterday afternoon to the arguments of counsel, defending Spitzer, Bendernagel and the others, in which a dismissal of the indictment was asked for but rendered no decision. It is expected he will deny the motion this morning.

#### "Told to 'See Bendernagel.'

"Prior to the argument the Government had rested after several witnesses had testified. One was Thomas D. Hyatt, a weigher, who had taken charge of the district including Havemeyer & Elder's refinery in October, 1897. He said:

"'Mr. Spitzer approached me and asked me to come up to the office and meet Mr. Bendernagel. I declined. I asked what they were going to charge as rent for the two offices which the weighers were to occupy. Spitzer said, "Oh, never mind that. We usually give that to the head weigher and a good

deal more besides. You come to the office at the end of the month and Bendernagel will hand you an envelope. You need only shake hands with him, you don't even have to speak to him."

" 'I declined again, and told him that I would rather wait a month or two until they could see how they liked my administration. Spitzer said: "We don't do any business with the assistant weighers; we do it all with the head weighers." '

"Later, Hyatt said, he met Bendernagel. He did not, however, complete the usual term of a head weigher in that district. The usual term was one year. He served three months and eleven days. So it was whenever he was sent back there. His term was always a short one.

"Hyatt swore that he had made written report of the occurrence to Surveyor of the Port Croft, now dead. No action was taken on it and when he had a search made for the document it could not be found. He said he had made a copy, but it was not offered in evidence.

"Another witness was Harvey E. Miller of the Fairbanks Scale Company, who testified that in his opinion the scales used on the sugar piers had been changed since they were bought. In examining them, he said, he found bolt holes showing that the scales originally had a longer beam than they had when the spring was used.

"The trial will be continued to-day."

"Frauds in Sugar 'Passed Up' to Trust Officials. Federal Grand Jury Expected to Indict on Evidence Got at Employee's Trial. Crooked Scales Case. Inventor of 'Corset Spring' Called as Witness. How Parr's Foe 'Got Even.'

"While the 'goats' in the Sugar Trust fraud cases, the minor employees in the crooked scales conspiracy, are fighting hard for freedom, the Federal Grand Jury is again busy, and at least one prominent official of the trust will probably be indicted. He knew of the 'corset spring' device, according to the man who invented it and who was a witness before the Grand Jury yesterday.

"Counsel for the trust employees now on trial yesterday raised the question of jurisdiction and moved to dismiss. This motion will probably be dismissed this morning and the case go on.

"On Wednesday Judge Martin of Vermont, who is trying the cases of Bendernagel, Spitzer and the four checkers, swore in the Federal Grand Jury for December. One of the first witnesses examined was John H. Thompson, a clerk at No. 117 Wall street, the office of the Sugar Trust, who had appeared before the petty jury hearing the cases against Spitzer, Bendernagel and others.

### "Officials are named.

"Thompson, it is understood, made known the official of the Sugar Trust upon whose acquiescence he paid the bills of the sugar shippers, which were based, not upon the Government weights, but upon the weights returned by the city weighers. He declared distinctly that he acted under instructions, and by his testimony an official of the trust is implicated in the frauds.

"The December Grand Jury also examined a witness named O'Connell, who had not appeared in the criminal trials. It is said he testified to having invented the corset steel spring device and to having shown it to an official of the trust who referred him to Oliver Spitzer, dock superintendent. His testimony, it is understood, corroborated Thompson's to an extent.

"That action against some official higher up than Bendernagel was not taken by the previous Grand Jury is said to have been due almost entirely to the action of Breczinzski, the former deputy treasury agent, who, with Richard Parr, was on the Sugar Trust piers when the raid was made on the crooked scales on November 20, 1907. He has been at odds with Parr and appeared before the former Grand Jury voluntarily.

### "Spoiled Parr's Work.

"Breczinzski told the Grand Jury that Parr was not to be believed under any circumstances. Presented with a case based on Parr's testimony and

seemingly convincing, the Grand Jury found itself with a record on which every allegation made by Parr was declared a falsehood and refused to return an indictment.

"Judge Martin listened all yesterday afternoon to the arguments of counsel defending Spitzer, Bendernagel and the others, in which a dismissal of the indictment was asked for, but rendered no decision. It is expected he will deny the motions this morning.

"Prior to the argument the Government had rested after several witnesses had testified. One was Thomas D. Hyatt, a weigher, who had taken charge of the district including Havemeyer & Elder's refinery in October, 1897. He said:

" 'Mr. Spitzer approached me and asked me to come up to the office and meet Mr. Bendernagel. I declined. I asked what they were going to charge as rent for the two offices which the weighers were to occupy. Spitzer said:

"Had 'Envelope' for Him.

" 'Oh, never mind that. We usually give that to the head weigher and a good deal more besides. You come to the office at the end of the month and Bendernagel will hand you an envelope. You need only shake hands with him, you don't even have to speak to him.'

" 'I declined again, and told him I would rather wait a month or two,. until they could see how they liked my administration. Spitzer said: "We don't do any business with the assistant weighers; we do it all with the head weighers." '

"Later, Hyatt said, he met Bendernagel. He did not, however, complete the usual term of a head weigher in that district. The usual term was one year. He served three months and eleven days. So it was whenever he was sent back there. His term was always a short one."

[1] In Morrison v. Smith, 177 N. Y. 366, at page 368, 69 N. E. 725, at page 726, Judge Gray, expressing the unanimous opinion of the court, said:

"At common law, that which implied reproach, scandal, or ridicule to any person and reflected disgracefully upon his character, whether written or printed, was a libel, and was actionable without proof of special damage. The language used is to be understood by judge and jury in the same manner as others understand it, and words are to be taken in that sense which would be naturally conveyed to persons of ordinary understanding. The principle upon which the rule of legal liability for damages rests is that no man possesses the right to lessen the comforts or the enjoyment of another, and that, when he does so deliberately, wantonly, and maliciously, it is prima facie evidence of malice, and he is bound to make compensation for the mischief occasioned. Therefore if, by printing or writing, bad actions or vicious principles are imputed to a man, and his respectability is diminished, his comfort and his enjoyment are lessened by the attendant disgrace, contempt, or ridicule, and damage will be presumed. See Folkard's Law of Slander and Libel (5th Ed.) pp. 165, 172, 177; Odgers' Libel and Slander (3d Ed.) pp. 7, 18, 336; Root v. King, 7 Cow. 613; Sanderson v. Caldwell, 45 N. Y. 398 [6 Am. Rep. 105]; Morey v. Morning Journal Association, 123 N. Y. 207 [25 N. E. 161, 9 L. R. A. 621, 20 Am. St. Rep. 730]. If the language is unambiguous, whether it is actionable becomes a question of law; but if ambiguous,. and capable of an innocent as well as of a disgraceful meaning, the question becomes one for the jury to settle. When the defamatory meaning ,is not apparent, innuendo is necessary. If the words are incapable of the meaning ascribed to them by the innuendo, and are prima facie not actionable, the complaint should be dismissed. If they are capable of such a meaning, however improbable it may appear, the jury should say whether they may be so understood. Odgers' Libel and Slander, 107; Sanderson v. Caldwell, 45 N. Y. 398 [6 Am. Rep. 105]."

In deciding whether or not an article is libelous, the scope and the object of the entire article are to be considered together, and "such

a construction put upon its language as would naturally be given to it." More v. Bennett, 48 N. Y. 472, 476; Klaw v. New York Press Co., 137 App. Div. 686–688, 122 N. Y. Supp. 437. In Cooper v. Greeley, 1 Denio, 358, Jewett, J., said:

"The construction which it behooves a court of justice to put on a publication which is alleged to be libelous is to be derived as well from the expression used as from the whole scope and apparent object of the writer."

See, also, Weston v. Commercial Advertiser, 184 N. Y. 479, 77 N. E. 660; Gates v. New York Recorder Co., 155 N. Y. 229, 49 N. E. 769.

[2] The complaint sets out various provisions of the statutes of the United States, stated at the time to be in force, not, I am bound to say, of necessity, as the court may take judicial notice of the supreme law of the land, in the body of which are acts of Congress, passed in pursuance of the Constitution. Milliken v. Dotson, 117 App. Div. 527, 529, 102 N. Y. Supp. 564. The provisions cited read as follows:

Section 9 of the Act of Congress of the United States of June 10, 1890 (26 Stat. 135, c. 407 [U. S. Comp. St. 1901, p. 1895]):

"That if any owner, importer, consignee, agent, or other person shall make or attempt to make any entry of imported merchandise by means of any fraudulent or false invoice, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall be guilty of any willful act or omission by means whereof the United States shall be deprived of the lawful duty, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper, or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from the person making the entry, shall be forfeited, which forfeiture shall only apply to the whole of the merchandise or the value thereof in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates; and such persons shall, upon conviction, be fined for each offense a sum not exceeding five thousand dollars, or be imprisoned for. a time not exceeding two years, or both, in the discretion of the court."

Section 5440 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 3676):

"If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars, or to imprisonment for not more than two years or to both fine and imprisonment in the discretion of the court."

Section 5445 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 3678):

"Every person who, by any means whatever, knowingly effects or aids in effecting any entry of any goods, wares, or merchandise at less than the true weight or measure thereof, or upon a false classification thereof as to quality or value, or by the payment of less than the amount of duty legally due thereon, shall be fined not more than five thousand dollars, or be imprisoned not more than two years, or both."

Saying in a published article, in which reference is made to weighing trickery and crooked scales, falsely that one is an inventor of a

corset steel spring device which was shown by him to an official of an organization charged with frauds in weighing a dutiable article, which official referred him to a superintendent, who was, at time of publication, on trial for like frauds against the government, in my judgment fairly charges him with an offense against the statutes cited, without the necessity of extrinsic averments.

[3] The publication certainly imputed to the person named therein as the inventor of a fraudulent device a vicious act, tending to diminish his respectability and impair his comfort by the attendant disgrace and contempt. The publication was made at a time when the American Sugar Refining Company, its officers, and employés were charged with defrauding the government of the United States by fraudulently tampering with the scales upon which sugar, a dutiable commodity, was weighed for the purpose of determining the amount of import duty. The device by which the scales indicated a false result was a corset steel spring. These charges were the subject of judicial investigation at the time of publication. That investigation was conducted in the city of New York, the place of publication. The details of the investigation and the character of the charges were conspicuously published and widely circulated. This combination of circumstances is set forth in the complaint, doubtless as a matter of extra caution. These allegations clearly manifest the libelous character of the articles. In Sanderson v. Caldwell, 45 N. Y. 398–401, 6 Am. Rep. 105, the court said:

"The publisher of a libel cannot escape liability by veiling a calumny in artful or ambiguous phrases, or by indirectly charging that which would be slanderous if imputed in direct and undisguised language. The language of the publication in this case, if capable of an innocent construction, is also clearly capable of a construction which would make it libelous."

The learned counsel for the defendant perhaps naïvely suggests that to say of a person that he is the inventor of a corset steel spring is an innocent observation. If the observation were dissevered from the remainder of the publication, and dissociated from the circumstances that gave it offensive significance, agreement with him would be pleasant and permissible. His contention is that the article "is merely disparaging," and not in any sense libelous. He seems to suggest that the author should be extolled as the contriver of an artful masterpiece of nonactionable defamation, and not adjudged to be the writer of a really libelous production. I must disagree with his views of the publication. Levey v. Brooklyn Union Publishing Co., 65 Misc. Rep. 373, 121 N. Y. Supp. 643, affirmed 137 App. Div. 947, 123 N. Y. Supp. 1126, and 202 N. Y. 555, 95 N. E. 1132.

I am compelled to hold that the facts stated in the complaint constitute two good causes of action.

Demurrer overruled.